**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

EAMMA SAFI and ZHI GE a/k/a JOSH GE,

Defendants.

**Civil Action No. 25-cv-**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges as follows against Defendants Eamma Safi ("Safi") and Zhi Ge a/k/a Josh Ge ("Ge"):

### SUMMARY OF THE ACTION

1.      From in or about 2017 through in or about 2024, Safi and Ge willfully participated in an international insider trading scheme that netted them millions in illicit profits from trading in advance of market-moving announcements. The scheme (the "Tipping Scheme") involved tips that originated from persons known to Safi or his close associates.

2.      In the Tipping Scheme, Safi directly or indirectly obtained from insiders (including one or more sources at publicly traded companies) material nonpublic information about impending corporate transactions or other confidential information that could move the market, such as earnings announcements. Safi then tipped Ge as well as another individual ("Trader A") recruited by Ge, and all three traded profitably on the tips of inside information. Safi and/or Ge demanded and received kickbacks of trading profits from Trader A in exchange for such information.

3.      Using the illegal tips, Safi and Ge – along with Trader A – generated millions in

illicit profits trading the securities of numerous companies, both through their individual trading accounts and through brokerage accounts in the names of other people and entities that were controlled by Safi, Ge, and/or Trader A.

4.     Safi and Ge knew or were reckless in not knowing they were trading while aware of and on the basis of material nonpublic information obtained from insiders at public companies and/or other sources owing a similar duty to maintain the confidentiality of such information.

5.     By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants Safi and Ge violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

6.     The Commission brings this action under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against the Defendants, to enjoin them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of profits realized from the unlawful trading set forth herein, along with prejudgment interest; and civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and for such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business constituting the violations made use of a means or instrumentality of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

8.     Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the District of Massachusetts. Among other things, certain of the options trades executed by Safi, Ge, and/or Trader A in connection with this scheme, including in Medidata Solutions, Inc. and Cytokinetics, Inc., were conducted through the BOX Options Exchange (BOX), located in Boston, Massachusetts.

## THE DEFENDANTS

9.     **Safi**, age 37, has resided in the United Arab Emirates and is a German citizen. Safi is the owner of Emallates.com FZE, and purportedly works in the information technology industry.

10.     **Ge**, age 34, is a Singapore citizen. Ge is the owner of Belleby Holdings Pte Ltd., which purportedly manages restaurants and real estate.

## OTHER RELEVANT INDIVIDUALS

11.     **Trader A** is a U.S.-based securities trader who obtained material nonpublic information from Safi and/or Ge, and, as described in greater detail herein, traded on that inside information.

12.     **Safi's Associate** resides in France, previously worked in investment banking, and owned and operated a Paris restaurant in which Safi shared partial ownership (the "Paris restaurant").

13.     **Insider 1** resides in France and at times relevant to this Complaint worked in the M&A group of Atos S.E. ("Atos") and then Worldline S.A. ("Worldline"), publicly traded companies based in France which previously were affiliated. Insider 1 was an investor in the Paris restaurant and previously worked with Safi's Associate at a large investment bank.

3

**TYPES OF SECURITIES TRADED**

14.     In connection with the Tipping Scheme, Safi and Ge, along with Trader A and other tippees, established "long" positions in companies that were targeted for acquisition by purchasing shares of common stock, call options (a type of security that is typically purchased if the buyer believes the company's stock price will increase),[1] American depositary receipts, and/or contracts-for-difference.

15.     An American depositary receipt ("ADR") is a certificate issued by a U.S. bank that represents a specified number of shares of a foreign company traded on a foreign exchange and held by the bank overseas. ADRs are priced and traded in U.S. dollars on U.S. stock exchanges comparable to shares of stock in domestic companies. ADRs allow investors to functionally trade foreign equities on U.S. exchanges.

16.     A contract-for-difference ("CFD") is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed. If the share price of the underlying stock increases, the seller pays the difference to the buyer; however, if the share price declines, the buyer must pay the seller. A CFD related to a U.S.-listed company thus mirrors the movement and pricing of the underlying stock on a dollar-for-dollar basis. A CFD provider ordinarily hedges its exposure against a CFD buyer's long position by purchasing (directly or indirectly) a corresponding number of shares of the underlying U.S. company on a U.S. exchange through domestic brokerage firms.

---

[1] A buyer who purchases a call option for a stock has the opportunity, but not the obligation, to buy that stock for a specific price known as the "strike price" for a predetermined period ending on the "expiration date."

**FACTUAL ALLEGATIONS**

17.    Beginning in or about mid-2017, Trader A began receiving tips of material nonpublic information from Safi and/or Ge regarding public companies. Safi and/or Ge provided specific information, obtained directly or indirectly from corporate insiders and/or investment bankers, about upcoming announcements, including about earnings releases, acquisition offers, and/or other market-moving events expected to impact the share price of a publicly traded company. Safi and/or Ge further provided guidance about exactly when to buy securities of a given company, and, on occasion, directed Trader A to exit his investment if an anticipated announcement was no longer going to take place as expected.

18.    In furtherance of the Tipping Scheme, Safi directly or indirectly leaked material nonpublic information to journalists and news outlets, so that Safi and other scheme participants could profitably trade around the market reaction to the publication of such information, rather than waiting to potentially profit from a corporate press release. Trader A understood from Safi that he had connections with persons writing articles about upcoming deals; on one or more occasions Safi previewed for Trader A that news related to a deal was coming out and later identified which news agency would publish it.

19.    As described below, Safi and/or Ge provided material nonpublic information about U.S.-based public companies, as well as foreign public companies traded on foreign exchanges with ADRs that traded on U.S. exchanges.

A.    **Safi and Ge Recruit Trader A and Provide "Sample" Insider Trading Tip**

20.    Safi and Ge have known each other since at least 2016.

21.    By at least November 2016, Safi began recruiting Ge into the Tipping Scheme, and, to that end, invited Ge to visit Safi and Safi's Associate in Paris.

22.    On November 17, 2016, Safi messaged Ge (via Facebook Messenger) that "[Safi's Associate] wants to see you this Friday," adding that "Plan would be lunch and in the evening drinks." When Ge made remarks about the short notice for this trip to Paris, given the need for flight and hotel arrangements, Safi noted "We are doing business." After messaging further about Ge's travel plans, Safi wrote to Ge: "Friday you will be welcomed to our world of business."

23.    On or about November 19, 2016, Ge messaged Safi, asking "When do I meet [Safi's Associate] today," then adding "Can't wait to get started." After some more back and forth, with Safi indicating he needed to check the time of the meeting, Safi wrote: "So you will be 5:30 at the restaurant."  Later that day, Ge sent a message to Safi confirming his arrival: "I'm at [name of the Paris Restaurant] already."

24.    Also in November 2016, after the meeting at the Paris restaurant, Safi and Ge exchanged messages about recruiting more investors into the Tipping Scheme. Ge remarked to Safi that "this shit is easier than I thought… Everyone knows what's up lol … I thought peeps are gonna be more apprehensive."

25.    Safi and Ge began using code words to communicate about the Tipping Scheme. For example, "socks" and "shoes" were code for disposable (or "burner") cell phones and SIM cards, while "greens" was code for money, and "games" and/or "races" were code words for forthcoming corporate announcements which were not yet public.

26.    On November 21, 2016, Ge told Safi that Ge was recruiting his mother's friend into the Tipping Scheme, and they began discussing getting new "shoes" and "socks," *i.e.*, obtaining burner phones and new SIM cards to mask communications related to the scheme. Safi told Ge: "[N]ew socks and shoes is a must bro." In messaging Ge about the need for both "socks" and "shoes," Safi warned Ge that not changing burner cell phones and SIM cards was

6

the "major mistake people do." After being reminded by Safi to frequently change "shoes" and "socks," Ge messaged Safi: "[I]'ll change after every game, okay?"

27.    On November 24, 2016, Safi and Ge continued to message about recruiting investors, and Safi alerted Ge that a "race" was on the way, meaning that he was in possession of nonpublic information about an upcoming corporate deal. Safi touted to Ge how much money they would make, telling Ge: "Millions are like 12 to 15 months away worst case… hundreds of K [meaning, thousands] … Just [a] few months." Ge replied to Safi: "[L]et's do it."

28.    In or about December 2016, Safi traveled to Hong Kong and to Singapore so that he and Ge could recruit traders into the Tipping Scheme and provided some potential traders with a "sample" tip about an upcoming deal in a non-U.S. company.

29.    On January 8, 2017, Ge exchanged several messages with Safi and advised Safi that Ge was planning a trip to Los Angeles to "network … and exp[a]nd our business," meaning the Tipping Scheme.

30.    In or around February 2017, Ge met Trader A at a social event in California and they struck up a friendship.

31.    On March 10, 2017, Ge sent Safi an electronic message explaining that he had become close to Trader A.

32.    Shortly thereafter, Ge shared what he described as a "free sample" tip with Trader A regarding a potential acquisition of Kindred Healthcare, Inc. ("Kindred"), which at that time was a U.S. company headquartered in Louisville, Kentucky. Kindred shares traded on the New York Stock Exchange under the ticker symbol KND.

33.    Based on Ge's tip, Trader A purchased Kindred call options, but lost money on his investment because the call options that he purchased had too high of a "strike price." Although the price of Kindred stock rose in response to the announcement of the acquisition, the

stock price never reached the options' strike price and thus expired worthless. Nevertheless, Trader A expressed interest in the Tipping Scheme.

34.    On or about June 17, 2017, Ge informed Trader A that he would arrange for Trader A to meet "his partners" and "dine at their restaurant" in Paris.

35.    On June 23, 2017, Ge messaged Safi to ask if he was in Paris because Trader A wished to visit and "he's down for racing."

36.    Over the next several days, Ge corresponded separately with Trader A and Safi about the arrangements for the meeting.

37.    On or about June 29, 2017, Safi and Trader A met as planned at the Paris restaurant. Safi's Associate also attended. After dining together, Safi asked Trader A to discuss trading with him. As part of this discussion, Safi referenced having various sources of confidential information. Trader A agreed to join Safi's trading group and to share 50% of his trading profits.

38.    On June 29, 2017, Ge messaged Trader A inquiring about the outcome of his meeting with Safi. Trader A responded the next day, stating that the meeting was great and thanking Ge for making the introduction. As part of this same message thread that day, Trader A asked Ge what the percentage is for "you guys" and Ge responded "50.  I told you haha…Promoters take 50% profit off the door sales;" Trader A responded, "…it works."  Ge cautioned Trader A that "if he [meaning, Safi] told you something else there [meaning, in Paris] … [t]hat one would be the next one and it'll be charged."  Trader A responded: "Got it."

39.    After Trader A joined the group, Safi encouraged him to "find insiders," such as on Wall Street in New York City, and to refer other traders with resources to Safi. Ge likewise sought to recruit additional traders and insiders, once telling an associate that he "was looking for investment bankers in big banks working in M&A specifically."

**B.**      <u>Safi, Ge, and Trader A Establish Secret Communication Protocols</u>

40.      When Ge and Trader A first exchanged electronic communications, they used Facebook Messenger to send messages back and forth. But before tipping Trader A about Kindred (the "free sample" tip), Ge asked Trader A to download Signal to communicate. Signal is a secure messaging application that uses end-to-end encryption, which allows communications to remain private as between senders and recipients. Ge introduced Trader A to Signal, and Trader A understood that its purpose was to keep communications confidential.

41.      After Trader A met Safi in Paris in June 2017 and agreed to participate in the Tipping Scheme, Safi provided further instructions to Trader A about how to communicate to ensure that any communications would remain private. Safi explained that all electronic messaging about the group's trading should take place through disappearing messages on Telegram, a cloud-based application that stores user data in encrypted form and permits users to set messages or photographs to disappear within a period as short as minutes or seconds. Safi told Trader A to obtain a "burner" (or, disposable) phone, use it to activate Telegram, and then extract the SIM card from the burner phone and throw it in the trash.

42.      Safi also provided instructions to Trader A about how to communicate in code about their trading on material nonpublic information: all communications regarding public issuers would be disguised as conversations about women and/or girlfriends, and the issuers would be given female code names with a first letter that corresponded to the first letter of the company. For example, "Kindred" was coded as "Kelly" in the chats.

43.      As with Ge, Safi used code words with Trader A in communications about trading on material nonpublic information. In addition to "shoes," "socks," "greens," and "races," Safi, Ge, and Trader A also used the term "sniper" to refer to inside information that they considered especially strong and reliable, and thus likely to generate substantial trading profits.

44.     After they began trading together, Safi also directed Trader A to delete any message threads that mentioned his name. Trader A complied with this directive.

### C.     Safi and Ge Require Kickbacks from Trader A in Exchange for Tips

45.     After an initial grace period in which Trader A received tips and accumulated trading profits, Safi addressed with Trader A the need for Trader A to make a payment, with Safi explaining he would "pass on the gift," meaning Safi needed to pay his sources for the inside information tipped to Trader A.

46.      In or about August 2018, Safi specifically instructed Trader A to pay Safi 100,000 Euros as partial payment for their trading activity since June 2017. When Trader A expressed concern to Safi over the size of the withdrawal, Safi directed Trader A that if he was questioned by bank personnel, Trader A should lie and tell them that he needed the money for an art deal or for gambling.

47.     In or about September 2018, Safi instructed Trader A to meet him in Vienna, Austria to make the payment.  Trader A traveled from the Czech Republic to Vienna and met Safi at a café, giving him the money in a plastic bag.

48.     In March 2020, Safi requested another payment from Trader A – this time for $300,000. Ge also began communicating with Trader A to tell him to make the payment. Ge directed Trader A to wire the funds to a bank in Hong Kong in the name of an associate of Safi and Ge, so that the funds were not traceable to Safi or Ge. As a cover story for the payment, Ge told Trader A to say it was a payment to an antique watch dealer that only accepted cash.

49.     On or about April 1, 2020, Trader A made the $300,000 payment as directed by Safi and Ge. Around this same time, Ge sent a DHL box containing a toy to Trader A's home to make it look like Trader A had in fact ordered something from overseas.

**D.** **Safi, Ge, and Trader A, on Multiple Occasions, Trade Together on Material Nonpublic Information from Insider 1**

50.    Safi, Ge, and Trader A generated substantial profits purchasing the securities of companies (including U.S.-traded companies) that were being targeted for acquisition, and/or for which Safi and Ge had other confidential information that was likely to cause the stock price to move, in advance of such information being disclosed to the public. This coordinated pattern of insider trading specifically included, on information and belief, trading on material nonpublic information obtained from Insider 1, who had timely, advance knowledge of the information in the Atos and Worldline corporate announcements addressed below, while owing a duty to keep such information confidential.

**December 2017 Atos Offer to Acquire Gemalto**

51.    For example, in or about November 2017, Safi directly or indirectly tipped material nonpublic information to Ge and Trader A in advance of the December 11, 2017 announcement by Atos that it had made an all-cash offer to acquire Gemalto, N.V. ("Gemalto"). Gemalto was a cybersecurity company headquartered in the Netherlands that traded on the Amsterdam Stock Exchange, with ADRs that traded over-the-counter in the United States under the ticker symbol GTOMY. By November 1, 2017 (or earlier), Insider 1 had knowledge of the contemplated Atos-Gemalto transaction.

52.    In tipping Trader A, Safi described the material nonpublic information regarding the still-secret plan for Atos to make an all-cash offer to acquire Gemalto as a "sniper" deal, meaning that Safi had a high level of confidence the information was accurate and the expected announcement would result in substantial trading profits for Safi, Ge, and Trader A.

53.    On or about November 24, 2017, Safi began purchasing shares of Gemalto.

54. On or about November 28, 2017, Trader A began purchasing U.S.-traded ADRs of Gemalto, and then expanded his trading in Gemalto to include shares and foreign options between November 29, 2017 and December 8, 2017.

55. On December 8, 2017 (a Friday), Trader A messaged a family member to whom he had been passing along tips from Safi: "[L]ast chance to buy GTOMY before it takes off."

56. On Monday, December 11, 2017, Atos announced a bid to acquire Gemalto, and the price of Gemalto shares increased by 35%.

57. The same day, Trader A removed Safi as a "friend" on Facebook to conceal their association.

58. As a result of his trading Gemalto securities based on inside information, Safi realized approximately $225,000 in illicit trading profits from trading in equities.

59. As a result of his trading Gemalto securities based on inside information, Trader A generated approximately $130,000 in illicit trading profits, comprised of approximately $15,000 from trading Gemalto ADRs and $115,000 from trading in Gemalto shares and options. Trader A also generated approximately $400,000 in illicit profits trading in Gemalto and GTOMY through his spouse's trading accounts, which he controlled.

60. On December 26, 2017, Ge sent a Facebook Messenger communication to Trader A, saying: "Hope you're good and hope you're satisfied with the gift from [Safi] and I! 😊" Trader A responded: "[H]ey yeah bro, Merry Christmas… [M]ore to say but I won't say it here … but thank you, thank you, thank you."

**July 2018 Atos Offer to Acquire Syntel**

61. Safi also directly or indirectly tipped material nonpublic information to Trader A in advance of the July 22, 2018 announcement that Atos had agreed to acquire Syntel, Inc. ("Syntel"), a U.S.-based IT services company traded on NASDAQ under the ticker symbol

"SYNT." Insider 1 had access to material nonpublic information concerning the transaction, including, without limitation, in January, June, and July 2018.

62.    On or about June 4, 2018, Trader A began buying Syntel call options through an account in the name of his spouse.

63.    On or about June 29, 2018, Trader began buying Syntel call options in his own account(s) and purchased additional Syntel securities in or about early July 2018.

64.    As a result of his trading Syntel securities based on inside information, Trader A generated approximately $200,000 in illicit trading profits from trading in Syntel shares and options. Trader A also generated approximately $210,000 in illicit profits trading in Syntel shares and options through his spouse's trading accounts, which he controlled.

**October 2018 Atos Negative Earnings Announcement**

65.    In or about October 2018, Safi again directly or indirectly tipped Trader A with material nonpublic information concerning the French company Atos – this time, that Atos would soon announce lower-than-expected revenue growth and a reduced profit forecast for the year.

66.    In tipping Trader A, Safi described the negative earnings announcement from Atos and told Trader A that it was a "sniper" – meaning that the nonpublic information about Atos was highly likely to be accurate and Trader A could trade with confidence on the tip.

67.    On October 22, 2018, Trader A used foreign accounts held in his spouse's name to purchase CFDs and options, anticipating that Atos's stock price would decline.

68.    On October 23, 2018, Atos issued negative earnings guidance. In the wake of the announcement, the company's stock price declined 22% by the end of the trading day.

69.     In total, Trader A realized approximately $110,000 in illicit profits from trading around the Atos negative news, which was comprised of approximately $16,000 in CFD trading profits and $94,000 in options trading profits in his spouse's account.

**January 2019 Atos Spinoff of Worldline Shares**

70.     In or about December 2018, Atos began discussions with Worldline to distribute approximately half of Atos's 50% ownership stake in Worldline to Atos shareholders through a share distribution.

71.     On or about December 12, 2018, Safi began buying Atos call options, and Trader A began buying U.S.-traded Atos ADRs in an account in his mother's name.

72.     On December 13, 2018, Insider 1 received official notice that he was considered an insider on the potential Atos/Worldline transaction.

73.     On December 17, 2018, Trader A began purchasing Atos call options through an account in his spouse's name.

74.     On January 9, 2019, Ge communicated with Trader A, advising Trader A that Ge would write to Trader A "on other," meaning Signal or Telegram.

75.     On or about January 9, 2019, Ge began buying Atos call options, and on the following day, January 10, 2019, Trader A bought Atos CFDs through an account in his spouse's name.

76.     On January 14, 2019, Safi purchased Atos call options.  On the same day, Ge added to his own options position in Atos and messaged another scheme participant, ordering him to contact Ge as soon as possible and noting that "the business we are doing is very serious." This individual began purchasing call options in Atos on or about that same day.

77.     On January 28, 2019, Trader A purchased U.S.-traded Atos ADRs (ticker symbol AEXAY).

78.     Two days later, on January 30, 2019, Atos announced a plan to distribute a portion of the share capital of Worldline to Atos investors, and that pursuant to this plan, "Atos' shareholders [we]re expected to receive 2 Worldline shares for 5 Atos shares held." Following the announcement, the price of Atos shares closed about 5% higher than the prior trading day.

79.     Also on January 30, 2019, Ge again messaged with the other scheme participant referenced in paragraph 76 above, telling him not to make any independent moves ("[I]'ll instruct you what to do") and the next day ordered him to "start transferring the profits on my share to your bank." On February 1, 2019, Ge messaged this individual again to check on the status of the profit transfer, stating: "I gotta collect from you asap gotta pay some peeps."

80.     As a result of his illicit trading of Atos securities based on inside information, Ge generated approximately $240,000 in trading profits.

81.     As a result of his illicit trading of Atos securities based on inside information, Trader A generated approximately $40,000 in trading profits in accounts in his own name and in his spouse's name.

82.     Safi did not generate profits from his above-described options trading in advance of this announcement because those options positions were closed before January 30, 2019.

**February 2020 Worldline Offer to Acquire Ingenico**

83.     In or about October 2019, Safi directly or indirectly tipped material nonpublic information to Trader A in advance of the February 3, 2020 announcement that Worldline had agreed to acquire French rival Ingenico Group SA ("Ingenico"), which traded on the Paris Stock Exchange, with ADRs that traded over-the-counter in the United States under the ticker symbol INGIY. Insider 1 had knowledge of the transaction by at least mid-October 2019.

84.     On or about October 14, 2019, Trader A began buying U.S-traded Ingenico ADRs in his account and Ingenico options through his spouse's trading accounts, which he controlled, and continued to trade Ingenico securities for several months.

85.     As a result of his trading Ingenico securities based on inside information, Trader A generated approximately $120,000 in illicit trading profits comprised of approximately $40,000 from trading Ingenico ADRs and $80,000 from trading Ingenico shares. Trader A also generated approximately $460,000 in illicit profits trading in Ingenico through his spouse's trading accounts, which he controlled.

### E.  Safi, Ge, and Trader A Trade on Material Nonpublic Information from Other Inside Source(s)

86.     In addition to the above-described Atos and Worldline corporate announcements, Safi and/or Ge traded on and/or covertly tipped material nonpublic information to Trader A in advance of other corporate news and announcements, including but not limited to acquisition offers for Medidata Solutions, Inc. ("Medidata"), Tiffany & Co. ("Tiffany"), and Wright Medical Group N.V. ("Wright Medical").

**April 2019 Dassault Acquisition of Medidata Solutions**

87.     On November 22, 2018, Paris-based Dassault Systèmes SE ("Dassault") entered into a confidentiality agreement with Medidata related to a potential acquisition transaction. At that time, Medidata was a technology company headquartered in New York and shares of Medidata traded on NASDAQ (ticker symbol MDSO).

88.     On February 15, 2019, after numerous board meetings, Dassault confirmed to Medidata via a telephone call that it was interested in acquiring Medidata.

16

89.    On February 19, 2019, Trader A began buying shares of Medidata via accounts in his name, his wife's name, and the name of an entity held in his wife's name. Then, two days later, Trader A purchased shares of Medidata in his parents' account.

90.    In early April 2019, Ge reached out to his cousin to ask for money, telling him that Ge was short on cash and that the "play" was happening soon.

91.    On April 21, 2019, Bloomberg News published an article about a possible purchase of Medidata by Dassault, and Medidata's stock price increased by approximately 14%.

92.    On or about May 1, 2019, Ge began buying Medidata call options. The following week, Ge messaged another trader and instructed him to "get ready"; the trader then began purchasing Medidata as Ge directed.

93.    On May 14, 2019, Ge sent a message to Trader A asking how things were going. Trader A responded that he was stressed but hoped "Maria" (code for Medidata) would "help take a little stress off next week."

94.    On June 12, 2019, Dassault formally announced that it had made an offer for Medidata at a 17% premium over the share price before the acquisition rumors began in mid-April 2019. Medidata's share price did not change significantly upon this announcement.

95.    In total, Trader A generated approximately $110,000 in profits from illicit trading in Medidata, including options trading in his own account and options and equity trading in his wife's account. Certain of these options trades were conducted on the BOX. Ge generated approximately $40,000 in illicit profits from trading in Medidata options.

**October 2019 LVMH Offer to Acquire Tiffany**

96.    On October 15, 2019, luxury goods conglomerate Louis Vuitton Moët Hennessy (LVMH), headquartered in Paris, France, approached U.S. jewelry company Tiffany,

17

headquartered in New York, New York and traded on the New York Stock Exchange under ticker symbol TIF, with an unsolicited offer to acquire the company for $120 per share.

97.    Trader A was in Ibiza in October 2019 when he was contacted via Telegram by Safi, who urged him to look up TIF.

98.    On or about October 22, 2019, Ge tried to call Trader A, but Trader A missed the call. When Trader A reached out to Ge after missing the call, Ge wrote: "Let's talk on other" (meaning, on Signal or Telegram).

99.    On or about October 24, 2019, Trader A sent a message to a friend saying: "URGENT.  Buy Tiffany Co. symbol is TIF.  Load the fuckin' truck up."

100.    On or about October 24, 2019, Ge, Safi, and Trader A began buying TIF.

101.    On or about October 27, 2019 (a Sunday), news of the LVMH offer leaked to the press and both Tiffany and LVMH subsequently confirmed that preliminary discussions had taken place between the two companies regarding a possible transaction. On Monday, October 28, 2019, Tiffany's stock price closed at around $129 per share, an increase of approximately 32% from the closing price on Friday, October 25, 2019.

102.    In total, Trader A generated approximately $2,260,000 in illicit profits from equity and options trading in Tiffany in his own account, and an additional $1,280,000 from equity and options trading Tiffany in his wife's accounts. Ge generated approximately $1,660,000 in illicit profits from trading Tiffany CFDs and options. Safi generated approximately $3,090,000 in illicit profits from trading in Tiffany options.

**November 2019 Acquisition by Stryker of Wright Medical Group**

103.    Safi also tipped material nonpublic information to Trader A ahead of news that medical technology company Stryker, headquartered in Kalamazoo, Michigan, would acquire

18

Wright Medical, a medical device company based at the time in Amsterdam, Netherlands, with shares publicly traded on NASDAQ (ticker symbol WMGI).

104. On or about November 1, 2019, Safi, Ge, and Trader A all began buying Wright Medical securities, including buying by Trader A in his wife's account. The same day, Trader A sent a message to his sibling, saying: "I loaded you up today on Wright Medical. $1m position. It is up another 10% now in after-hours trading 🤣🤣🤣🤣🤣/News out after market close that Wright Medical is exploring a sale. Lucky timing on my bet 😉."

105. On November 1, 2019, post-market close, Bloomberg News published an unconfirmed report regarding Wright Medical's exploration of a potential sale.

106. On November 4, 2019, pre-market open, Stryker announced a definitive agreement to acquire all of the issued and outstanding shares of Wright Medical for $30.75 per share. Upon news of the acquisition, Wright Medical's stock price increased $7.03 or 32%, closing that day at $29.04 per share.

107. On or about the same day, Ge messaged Trader A "Yo bro" and Trader A responded "yo yo yo, it's Christmas time (:" and Ge replied "Yeah bro."

108. In total, Trader A generated approximately $1,070,000 in illicit profits from trading in Wright Medical, and his wife's accounts generated approximately $150,000. Ge generated approximately $1,100,000 and Safi generated approximately $565,000 in illicit profits from trading in Wright Medical.

**Late 2023/Early 2024: Trading Around Potential Novartis Acquisition of Cytokinetics**

109. On or before September 25, 2023, the Swiss pharmaceutical company Novartis AG ("Novartis") expressed interest in acquiring Cytokinetics, Inc. ("Cytokinetics"), a San Francisco-based biopharmaceutical company traded on NASDAQ (ticker symbol CYTK).

110. On or about September 29, 2023, Ge began buying Cytokinetics call options, and, by October 5, 2023, Safi had also begun trading Cytokinetics call options.

111. On or about October 12, 2023, Ge and Safi exchanged messages via Telegram about one of Ge's recruits (the "Recruit"), with Safi stating: "Cytk | Tell him upside from here 120% | At leak 40% | We wanna exit at leak … | And revisit the deal with options." On or about the same day, the Recruit purchased Cytokinetics shares.

112. On the morning of October 31, 2023, Bloomberg News published an article regarding takeover interest in Cytokinetics, and by the end of the day, the share price for CYTK had increased by 9% from the prior day's close.

113. On or about October 31, 2023, Safi and Ge sold nearly all of their Cytokinetics call options for a profit, after the Bloomberg article was published.

114. On or about December 28, 2023, as part of continued merger discussions between the companies, Novartis sent Cytokinetics a non-binding offer letter.

115. On or about January 6, 2024 (a Friday), Ge dispatched a Telegram message to the Recruit, conveying material nonpublic information from Safi about the nature and timing of anticipated Cytokinetics news: "Monday pre market | Tell him a strategic sell process | Has very firm timelines … And owners of Cytk are not amateurs is [Safi names investment firm]." The Recruit messaged Ge later that same day, asking "Hi bro guess nothing to do tonight? | Still on track for Mon?" Ge responded by relaying additional information from Safi: "Bro tell [Recruit]| We waiting if nova | Gies [*sic*] higher with bid | Because if leak comes | And we know that lets say nova wins at 124 | And leak take it to 140 | We sell | Or if it takes it to 120 | We well [*sic*] the short leg of the 125 call | Calls."

20

116.    On January 8, 2024, the Wall Street Journal reported that Novartis was in talks to acquire Cytokinetics, and Cytokinetics shares increased by 15%, but two days later, the Journal reported that Novartis was backing away from the Cytokinetics deal.

117.    Safi and Ge made at least approximately $275,000 from trading Cytokinetics securities based on material nonpublic information in or about January 2024.

118.    Both Safi and Ge purchased Cytokinetics call options over the BOX Options Exchange.

**February 2024 Novartis Acquisition of MorphoSys**

119.    In December 2023, Novartis began exploring the possibility of acquiring MorphoSys AG ("MorphoSys"), a German biotechnology company traded on the Frankfurt Stock Exchange with ADRs traded on NASDAQ.

120.    By January 3, 2024, Novartis had sent MorphoSys a non-binding acquisition proposal, and, on January 15, 2024, Novartis sent MorphoSys a binding acquisition proposal to purchase 100% of its stock for a 121% premium over its January 12, 2024 closing price.

121.    On or about the following day, January 16, 2024, Ge and two of his associates began buying MorphoSys call options and continued to do so over the course of the next two days. A third associate of Ge began buying NASDAQ-traded MorphoSys ADRs on January 30, 2024.

122.    On February 5, 2024, Novartis announced the acquisition of MorphoSys, and MorphoSys's stock price rose by approximately 50% over the next two days.

123.    In total, Ge made approximately $3.8 million in illicit profits from trading in MorphoSys options in advance of the Novartis acquisition announcement.

**CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

124.　The Commission re-alleges and incorporates by reference Paragraphs 1 through 123 above as if they were fully set forth herein.

125.　Safi and Ge traded, and/or tipped other individuals to trade, securities while aware, and on the basis, of material nonpublic information. Safi and Ge knew or recklessly disregarded that such information was material and nonpublic. Safi and Ge also knew, recklessly disregarded, should have known, or consciously avoided knowing that such material nonpublic information had been conveyed and/or obtained in breach of a duty or obligation arising from a similar relationship of trust or confidence.

126.　By engaging in the conduct described above, Safi and Ge, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

127.　By reason of the actions alleged herein, Safi and Ge violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

I.

Finding that Defendants Safi and Ge each violated Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

II.

Permanently restraining and enjoining Defendants from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by committing or engaging in specified actions or activities relevant to insider trading;

III.

Ordering each Defendant to disgorge, with prejudgment interest, all ill-gotten gains or unjust enrichment derived from all actions alleged herein;

IV.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l];

V.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

VI.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated:  March 4, 2025

By:    *Rua M. Kelly*

Rua M. Kelly (Mass. Bar No. 643351)
Michael D. Foster (Ill. Bar No. 6257063)
U.S. Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
Kelly direct: (617)-573-8941
Email:  kellyru@sec.gov

24